LAURENCE BALTES AND LYDIA BALTES,
HUSBAND AND WIFE, APPELLANTS, V.
WARREN C. HODGES ET AL., APPELLEES.

301 N.W.2d 92

Filed January 23, 1981. No. 43063.

Wright & Simmons for appellants.

Raymond, Olsen & Coll, P.C., for appellees.

Heard before KRIVOSHA, C.J., McCOWN, and HASTINGS, JJ., and COLWELL and CANIGLIA, District Judges.

COLWELL, District Judge.

Plaintiffs appeal from a judgment denying a mandatory injunction to enforce restrictive covenants they imposed in their sale of commercial lots to defendants. Plaintiffs claim defendants constructed parking areas at excessive elevations. We affirm.

In 1959, Laurence and Lydia Baltes, plaintiffs, platted a 48-acre tract of land on the edge of Scotts-

bluff, Nebraska; piecemeal development followed. They leased an area (now Lot 1, Block 5, Baltes Second Addition) to Big John's Bar-B-Q Pit on which the lessee constructed a building and paved parking lot.

On October 5, 1977, plaintiffs granted an option to defendants Warren C. Hodges, Harry E. Palmer, Robert R. Kanard, and Francis Ferguson to buy a small tract of land, later replatted by plaintiffs, described as Lots 2, 3, 4, and 5, Baltes Second Addition, Scottsbluff, Nebraska. The five lots in Block 5 run north and south, fronting 27th Street on the south, and are numbered from east to west as Lots 1 through 5. Lots 2, 3, 4, and 5 are smaller than Lot 1, each being 50 feet wide east and west and 300 feet long north and south. Lots 2, 3, 4, and 5 at the time of the option were in their natural state, not level. The water drained naturally from west to east and generally in a southeasterly direction. Twenty-seventh Street on the south drained from west to east.

Plaintiffs had their attorney prepare an instrument entitled "Restrictive and Protective Covenants to Baltes Second Addition to the City of Scottsbluff, Scotts Bluff County, Nebraska," which generally restricted and regulated the lots in that addition as commercial lots; prohibited subdividing; restricted long-term parking; restricted location of buildings to setback lines; required building plans submitted to plaintiffs, including a "site plan"; limited advertising signs; prohibited noxious activities and the maintaining of livestock; and regulated garbage and trash. The instrument also provided that the covenants are to run with the land until October 1, 1990, and thereafter automatically extended. Particularly important to this action is a part of paragraph 5: "A grade plan shall be submitted showing lot surface drainage containment with all drainage exiting to the public street. Lots abutting on 27th Street shall be filled and graded so that all surface drainage shall flow south to curb and gutters on 27th Street. *All lot surfaces shall be*

*of approximate equal elevation so that they shall meet common grade at each property line."* (Emphasis supplied.) A part of paragraph 7 provides: "A vehicular service access lane shall be provided, paved and maintained open at all times, east and west across the full width of each lot to provide customer vehicular service access to each lot within the subdivision. Such service lane shall be provided within the 100 foot building setback area, and shall be continuous ACROSS all lots within the subdivision." This instrument was recorded in the office of the county Register of Deeds.

On November 6, 1977, the original parties executed a "Modification of Option," which further defined the terms of the original option and, particularly, the following: "Buyers consent to the Sellers adopting Restrictive and Protective Covenants, a copy of which is attached hereto to be applicable to lands described on the condition that the land immediately to the west thereof, when platted and annexed to the City of Scottsbluff by Sellers, have the same Restrictive Covenants.

"It is further agreed that Buyers shall bring the areas described, when a parking area is created and paved, *to the same elevation* as the parking lot on Lot One (1), Block Five (5), as it now exists." (Emphasis supplied.)

The option was exercised on November 17, 1977. For convenience two deeds were delivered: (1) Plaintiffs conveyed Lots 2 and 3, Block 5, Baltes Second Addition, to Donuts West, a partnership consisting of Warren C. Hodges, Harry E. Palmer, and Francis Ferguson; and (2) Plaintiffs conveyed Lots 4 and 5, Block 5, Baltes Second Addition, to Wyoming Fish and Chips, a partnership consisting of Robert R. Kanard, Harry E. Palmer, and Warren C. Hodges. Both conveyances were subject to easements, rights-of-way, and restrictions of record. Work on all lots began; construction on Lots 4 and 5 was completed, including leveling, dirt fill, a building for a fast-food business, and a hard-surface parking area. Work

on Lots 2 and 3 was limited to leveling and dirt fill. At the boundaries between Lots 1 and 2 and between Lots 3 and 4, the dirt level of Lots 2 and 3 was 3 inches lower, pending construction of the parking area.

All the lots were surveyed by defendants and elevation marks established along all the boundary lines and at midpoints. The midpoint elevations in feet were: Lot 1, 58.24; Lot 2, 58.45; Lot 3, 58.85; Lot 4, 59.85; and Lot 5, 59.71 (.25 must be added to Lots 2 and 3 to reflect elevation when hard surface added). Defendants admit that the overall parking elevation of the lots is not level with Lot 1. The evidence is that the elevations at the boundaries are approximately the same. Plaintiffs were particularly concerned about the elevations on the west side of Lot 5 for the reason that they still own that land, and they claim that the higher elevations would require more fill dirt when improved.

Prior to construction, defendants had plans and blueprints prepared which were submitted to plaintiffs. Defendants complied with all building codes and obtained all required permits. From the time construction began, plaintiffs complained to defendants concerning the elevations of the parking areas.

At the close of the trial, the trial judge made a personal inspection of the construction site.

"Broadly speaking, the enforcement of building restrictions is governed by equitable principles, and will not be decreed if, under the facts of the particular case, it would be inequitable and unjust, or not in furtherance of public interest. Whether injunctive relief will be granted to restrain the violation of such restrictions is a matter within the sound discretion of the trial court, to be determined in the light of all the facts and circumstances . . . ." 20 Am. Jur. 2d *Covenants* § 313 (1965). A mandatory injunction is a harsh remedy and it is not favored by the courts. See 42 Am. Jur. 2d *Injunctions* § 16 (1969).

"A restrictive covenant is to be construed in con-

nection with the surrounding circumstances, which the parties are supposed to have had in mind at the time they made it; the location and character of the entire tract of land; the purpose of the restriction; whether it was for the sole benefit of the grantor or for the benefit of the grantee and subsequent purchasers; and whether it was in pursuance of a general building plan for the development of the property." *Lund v. Orr*, 181 Neb. 361, 363, 148 N.W.2d 309, 310-11 (1967).

Plaintiffs assign as error that defendants were permitted over objection to adduce expert evidence that it was either impossible or very difficult to construct parking areas at exactly the same elevations on Lots 2, 3, 4, and 5. They argue that a strict interpretation of the restrictive covenants is required and that such evidence was not relevant. Such evidence was given by the experts, taking into consideration the circumstances existing at the time of the transaction, including restrictive covenants, natural contour of the land and its physical characteristics, natural drainage, required drainage, required building setback distances, proposed building plans, and governmental codes and regulations. By the very nature of this equitable action, such evidence was relevant to the claims of all parties.

Plaintiffs also assign as error that the trial judge wrongfully decided the case on such evidence. Such was not the record. He did make the following detailed findings reflecting the evidence and his personal inspection. "That while variations exist in elevations between Lots 1, 2, 3, 4 and 5, such variations are not readily ascertainable to the naked eye. That the lots herein are of approximate equal elevation at the line where each lot joins the adjoining lot. That it is presently possible and will be possible in the future upon the paving of Lots 2 and 3 to pass or drive among and to and from Lots 1, 2, 3, 4 and 5 without obstruction or without any significant change in grade or level.

"That while it is theoretically possible to have all

the lots at exactly the same elevation and comply with the drainage provisions of all drainage south to 27th Street, the evidence is clear that such construction is not practical from an engineering standpoint and that severe physical distortion of the Lots 2, 3, 4 and 5 would be the result of such efforts." Those findings were proper under the evidence and his personal inspection.

Plaintiffs also assign as error that the trial judge failed to allow them to cross-examine a witness following an interrogation by the judge, all being contrary to Neb. Rev. Stat. § 27-614 (Reissue 1979). The record shows that at the conclusion of all the evidence the trial judge asked the last witness several questions. Thereafter, plaintiffs' counsel asked one question and then stated: "Okay. The floor is what confused me, I guess." This was followed by the judge saying, "I'm not opening this up for further cross-examination." This, then, concluded the evidentiary record. Plaintiffs made no objection to the record as made and they made no request to further interrogate the witness. There is no prejudicial error in that part of the record.

The other assigned errors are without merit. We now consider the merits de novo.

"An unambiguous contract is not subject to interpretation or construction, and the intent of the parties must be determined from its contents. . . . A contract will be construed most strongly against the party preparing it when there is a question as to its meaning." *Timmerman Bros., Inc. v. Quigley*, 198 Neb. 129, 132, 251 N.W.2d 877, 879 (1977). See, also, 20 Am. Jur. 2d *Covenants* §§ 5, 185, 186 (1965).

The restrictive covenants were imposed upon the land by plaintiffs with knowledge of the conditions and circumstances then existing, as heretofore discussed, which are to be considered in construing the restrictive covenants.

We find no ambiguity in the restrictive and protec-

tive covenants and the evidence does not support plaintiffs' theory of strict interpretation that overall level parking was required. We believe that the intent of the parties can be determined from the covenants, to the end that the defendants have complied with them as they relate to the parking area common grade at the property lines on Lots 2, 3, 4, and 5. The phrase "approximate equal elevation," as contained in paragraph 5 of the covenants, means more or less, about, or near to the elevation of abutting lots so that they provide free and normal pedestrian and vehicular traffic across all lots. There was no error in denying a mandatory injunction.

There being no evidence to support plaintiffs' allegation and prayer for a reformation of agreements, their petition was properly dismissed.

AFFIRMED.